UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID WATSON, | No. 2:21-cv-02081-DJC-EFB (HC) |
| Petitioner, | |
| v. | FINDINGS AND RECOMMENDATIONS |
| R. GODWIN, Warden, | |
| Respondent. | |

Petitioner is a state prisoner without counsel seeking a writ of habeas corpus pursuant to 28 U.S.C. § 2254. ECF No. 1. He challenges his convictions in the Sacramento County Superior Court for kidnapping and child abduction. A jury also found true an allegation that petitioner personally used a dangerous weapon in commission of the offense. Petitioner was sentenced to a third-strike sentence of 36 years to life in prison. ECF No. 19-8. Petitioner alleges that the trial court erred by adding language to the "mistake of law" jury instruction. ECF No. 1 at 5, 16-20. In addition, petitioner maintains that his trial counsel rendered ineffective assistance of counsel. *Id.* at 7, 20-23. For the reasons that follow, the petition must be denied.

**I.      Procedural Background of Section 2254 Petition**

Petitioner initiated this case without counsel on November 8, 2021 (ECF No. 1) and respondent filed his answer on January 13, 2022. ECF No. 11. Attorney William O. Davis entered an appearance on petitioner's behalf on February 17, 2022, and the court provided

petitioner with a 30-day extension of time to file a reply. ECF Nos. 12, 13. The court granted a second extension for 60 days on March 29, 2022. ECF No. 15. The docket then remained inactive until December 15, 2022, when petitioner informed the court that he had learned Mr. Davis had died, and requested an extension of time, and copies of all court filings in this case after January 13, 2022. ECF No. 16.

The court ordered petitioner to either file a reply or provide documentation confirming Mr. Davis' death and seek additional time to file a reply. ECF No. 17. Petitioner subsequently provided proof of counsel's death in the form of a copy of Mr. Davis's death certificate filed by petitioner's sister. ECF No. 18-1. Petitioner did not, however, specifically request additional time to file a reply. ECF No. 18. Nonetheless, the court subsequently ordered that relevant parts of the docket be sent to petitioner, and that petitioner be granted a further extension either to file a reply, or to file a request for a specific and reasonable extension of time. ECF No. 22. Petitioner did not do so, and thus, the matter is now submitted.[1]

## II.   Background

The facts, as relayed by the California Court of Appeal[2], are:

*I. Prosecution's Case*

Kenya's daughter, Christina, is the mother of defendant's son. When Christina was arrested for illegal manufacturing of methamphetamine for sale and felony child endangerment on September 27, 2016 [footnote 2 omitted], her and defendant's son was placed with Shasta County Health and Human Services Agency – Children's Services (Children's Services). The child was just over five months old.

On September 28, defendant asked Kenya to pick up his son from Children's Services. He also advised Kenya about Christina's court hearing and said he would not be there because he was avoiding arrest. Kenya responded she would contact Children's Services and do what was needed. Defendant told her not to mention him to Children's Service or the police.

Kenya drove from Sacramento to Shasta County to get her grandson. Children's Services released the baby to Kenya on September 29. The Children's Services safety action plan provided Kenya agreed not to allow Christina or defendant to leave with the child, and "[t]he parents w[ould] not be allowed to have

---

[1] Petitioner did file a motion to appoint counsel, which was denied. ECF Nos. 23 & 24.

[2] The facts recited by the state appellate court are presumed to be correct where, as here, the petitioner has not rebutted the facts with clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Slovik v. Yates*, 556 F.3d 747, 749 n.1 (9th Cir. 2009) (as amended).

unsupervised visits with the child." It further provided Kenya agreed to apply for emergency guardianship within five business days and to "follow-up" with a petition for permanent guardianship

Defendant spoke with a Children's Services social worker on October 4. He told the social worker it was wrong to keep his child from him; he sounded "spun" and under the influence of methamphetamine. The social worker told defendant the Children's Services would place the baby with a viable relative, if it was an option. Defendant responded "wrong answer," and asked to speak to a supervisor. The supervisor reiterated what the social worker had told him. There was no dependency action filed in Shasta County because the safety action plan was in place. Thus, there were no orders from Shasta County Superior Court requiring defendant to have supervised visits with his son.

Kenya filed a petition for temporary guardianship, as required by the Children's Services safety action plan. On October 6, when defendant called Kenya, she told him a guardianship hearing would occur on October 7 in Sacramento County. [Footnote 3]. Defendant responded he would not be there, stating "[h]e would not be set up to be arrest with a whole lot of F words." Kenya was granted temporary legal guardianship of her grandson on October 7.

> [Footnote 3]: On the declaration of notice of ex parte application, Kenya wrote she gave defendant notice on October 5. At trial, she wrote down the wrong date; after she reviewed her phone records, she believed the correct date was October 6. The parties stipulated to a trial exhibit containing phone records. The records showed a phone number subscribed to by defendant called Kenya on October 6.

On October 10, Kenya sent a text message stating: "I don't think I explained things well last night. I was half asleep. The state took him and has steps in place for you both to learn to better [sic] safe life for your son. Here [are] some ideas to prove to them you're ready to provide a safe home for him. One, attend [Narcotics Anonymous] meetings daily. Have an attendance for signed and date stamped. [¶] Two, contact Tracie [at Children's Services] and attend her suggested parenting classes. Three, together attend domestic violence classes at One Safe Place. Go to all court dates. Remove all drugs and persons who are on drugs from your lives. [¶] The state has another court date set for December 29th, 2016, to decide whether you both have made the required changes for him. Hopefully this helps you be successful. He deserves the best you both have to give."

Christina called Kenya to schedule a supervised visit with the child for October 12. Kenya did not know defendant would be joining Christina. Kenya asked her friend, Crissy, to assist her in the supervised visit. Christina and defendant arrived in the early evening. Defendant had bandages on his arms, from his thumbs to his elbows. Christina and defendant spent time with their child in the living room and talked to Kenya and Crissy about arranging regular supervised visits and what was needed to regain custody. Crissy testified defendant knew Kenya had custody and "understood that there was a process that needed to happen in order for hm to gain custody."

At some point, Christina asked Kenya to step outside with her. Kenya complied and the two talked directly outside the front door. While Christina and Kenya were outside, defendant stood up from the couch, holding his son. Crissy asked him to sit down. Defendant responded, "this is my fucking baby," and walked out the front door. Crissy asked him to stop but he did not comply. Kenya stepped in

3

front of defendant to block his way and told him to put the baby down. Defendant said he was going to show the baby a dog they had in the car and "used his hip kind of like a basketball move" while "tuck[ing] the baby under his arm" to get around her. Defendant walked down the driveway toward the car. He pulled out a knife approximately nine or 12 inches in length, swung it around, and pointed it at Kenya and Crissy.

Defendant got into the driver's side of the car with the baby and, after directing the dog to get into the backseat, Christina got in on the passenger's side. Kenya initially held on to the driver's side door but let go when defendant reversed at a fast speed. Kenya immediately called 911; the transcript of the call was played for the jury.

After police officers arrived at Kenya's house, Christina called her mother. Kenya put the phone call on speaker phone, allowing the police officers to listen to the conversation. One of those police officers testified he heard the entire conversation over the phone and heard both a male and female voice on the other end of the line. He said another officer told Christina and defendant to return the baby to Kenya's residence. A male voice responded the child was his legally "and it didn't matter what a [j]udge said." The officer replied Kenya had legal custody of the child; the call then abruptly disconnected.

## II.     Defense's Case

Defendant testified on his own behalf and introduced the testimony of his friend, Kim as well. Defendant lived in Kim's home with the baby for approximately two-and-one-half to three weeks after taking him from Kenya's home; he was arrested there. Defendant's and Kim's testimony established the following version of events.

Defendant was in a motorcycle accident on September 28 or 29, a day or two after Christina was arrested. Defendant believed he was in a coma for eight days; Kim said he was in a coma during several of her hospital visits. Defendant sustained two broken arms – one of his arms was in a hard cast and one was in a soft cast. He was therefore unable to manipulate his hands.

After defendant was discharged from the hospital, he and Kim went to Shasta County Superior Court "to get custody of [the baby]." Defendant asked the court clerk whether there were any active cases pertaining to his son in Shasta County; the clerk said no. Kim asked the clerk for paperwork to file for custody, but the clerk told her she could not have the paperwork until defendant had his child in his custody. Kim then called a local attorney and, based on that conversation, told defendant "there was no reason he could not get his son as long as there w[ere] no open cases."

Defendant and Christina drove from Redding to Sacramento to get the baby; defendant was driving with his legs and arms on the steering wheel, using his thumbs to steer. He did not have a knife with him. Defendant was happy to see his son and played with him on the couch. When Kenya mentioned the baby had a doctor's appointment the following Wednesday, defendant told Christina to tell Kenya that he [defendant] intended to leave with his child. Christina asked her mother to step outside. Defendant stood up from the couch holding his son; he wanted to show his son the dog in the car. Crissy told him to sit down and he responded "F-U, this is my son, I'm taking him." He then walked out the door sideways, squeezing by Kenya and Christina because they were standing by the

4

door. Kenya told defendant not to take his son and Crissy and Kenya tried to prevent him from leaving, but he walked by them. Defendant denied having a knife, explaining it was physically impossible to pull a knife because he was holding his son and had a cast on. He recalled either Kenya or Crissy holding on to his car door, but he "jerked the door shut and backed up and left" after Christina got in the car.

Defendant next stopped at a friend's house to borrow a car seat for his son. He received a call from a police officer, who told him to take the child back to Kenya's house. Defendant responded, "no, my son, and no [j]udge is going to tell me to do that." He clarified he was referring to "a [j]udge saying something in the future." They drove to Redding, where he dropped Christina off approximately a block from her house because he believed police officers would be waiting at the house to take him into custody. Defense counsel asked: "Why at this point in time wouldn't you want to see the police and say look, I'm the father, I have custody of this kid?" Defendant responded: "Because when he called me, bring the baby back, he was wanting the baby, and I didn't want to give my baby up, you know. [¶] . . . [¶] I just didn't want to have to go through that. I figured I had my baby, I wasn't giving him up."

Defendant denied having been served with any paperwork relating to his son prior to his arrest in this case, having been told by Kenya there was going to be a guardianship hearing in Sacramento County, knowing about the Children's Services safety action plan Kenya agreed to follow, and knowing about the custody order filed in Sacramento County.

On cross-examination, defendant acknowledged he knew Children's Services had taken his child when Christina was arrested, and he had asked Kenya to go to Children's Services to get the baby. He confirmed his injuries from the motorcycle accident were actually left wrist and right thumb fractures. The prosecution introduced some of defendant's medical records pertaining to his motorcycle accident. Defendant said he had not seen the records prior to his testimony.

The medical records show there was no evidence of a head injury and contained no mention of a coma; defendant discharged himself from the hospital on October 1, two days after the accident. The records further showed he arrived back at the hospital on October 2 via ambulance and was discharged the same day. Defendant said he could not recall discharging himself on October 1, or the circumstances relating to his admission and discharge on October 2. The medical records also showed he was admitted and discharged in the emergency department on October 10 for bilateral wrist pain. Defendant said he could not recall going to the hospital on October 10, but did recall going to the hospital at some point to get a new brace put on his hand.

Defendant recalled speaking to the Children's Services social worker but did not recall the date was October 4. He further said he did not recall speaking with Kenya on October 6 because he did not "remember a lot"; however, he was confident Kenya did not give him notice of the guardianship hearing because he would have remembered it. He further acknowledged he might have used methamphetamine but said he did not abuse it. He believed he was in a coma based on what others told him.

Kim acknowledged that she had previously been convicted of crimes; the prosecution outlines seeveral prior convictions. On cross-examination, Kim said

5

"[y]es," when asked: "And you told [defendant] that his son belonged to the county or the state until he got legal full custody papers and [he] needed to do it in the right way, correct?" The prosecutor also asked Kim whether she had told defendant to pretend to be in love with Christina and act "lovey-dovey" toward her to dissuade Christina from testifying against him. Kim said she did not. The prosecution then showed Kim two transcripts of telephone calls between herself and defendant when defendant was in jail. In the two calls, defendant expressed his concern that Christina would testify against him and Kim encouraged him to act "lovey-dovey" to discourage her from doing so. Kim denied that she helped create a plan to manipulate Christina and said defendant could have told her he needed to pretend to love Christian to dissuade her from testifying, but she could not recall.

Defendant said he mistrusted Christina and did not "want her to make [him] look bad." He explained: "I didn't want her to get me in trouble being mad about me getting the kid. Because now my thing was she is – couldn't have the kid for four years, so I figured I would get out of jail and I didn't have to worry about her and her mom taking my son." Defendant acknowledged he had several prior convictions for drugs, firearms, burglary, and assault with a firearm.

ECF No. 19-11 at 2-8.

Petitioner's appeal of his convictions was rejected by the state appellate court. ECF No. 19-11. The California Supreme Court denied review. ECF No. 19-13.

### III. Analysis

#### A. Standards of Review Applicable to Habeas Corpus Claims

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). A federal writ is not available for alleged error in the interpretation or application of state law. *Wilson v. Corcoran*, 562 U.S. 1, 5 (2010); *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Park v. California*, 202 F.3d 1146, 1149 (9th Cir. 2000).

Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas corpus relief:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

6

Under § 2254(d)(1), "clearly established federal law" consists of holdings of the United States Supreme Court at the time of the last reasoned state court decision. *Thompson v. Runnels*, 705 F.3d 1089, 1096 (9th Cir. 2013) (citing *Greene v. Fisher*, 565 U.S.34 (2011); *Stanley v. Cullen*, 633 F.3d 852, 859 (9th Cir. 2011) (citing *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)). Circuit court precedent "may be persuasive in determining what law is clearly established and whether a state court applied that law unreasonably." *Stanley*, 633 F.3d at 859 (quoting *Maxwell v. Roe*, 606 F.3d 561, 567 (9th Cir. 2010)). However, circuit precedent may not be "used to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced." *Marshall v. Rodgers*, 569 U.S. 58, 64 (2013) (citing *Parker v. Matthews*, 567 U.S. 37, 47-49 (2012) (per curiam)). Nor may it be used to "determine whether a particular rule of law is so widely accepted among the Federal Circuits that it would, if presented to th[e] [Supreme] Court, be accepted as correct." *Id*. Further, where courts of appeals have diverged in their treatment of an issue, there is no "clearly established Federal law" governing that issue. *Carey v. Musladin*, 549 U.S. 70, 77 (2006).

A state court decision is "contrary to" clearly established federal law under § 2254(d)(1) if it applies a rule contradicting a holding of the Supreme Court or reaches a result different from Supreme Court precedent on "materially indistinguishable" facts. *Price v. Vincent*, 538 U.S. 634, 640 (2003). Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case.[3] *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003); *Williams*, 529 U.S. at 413; *Chia v. Cambra*, 360 F.3d 997, 1002 (9th Cir. 2004). A federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Williams*, 529 U.S. at 412; *accord Schriro v. Landrigan*, 550 U.S. 465,

---

[3] Under § 2254(d)(2), a state court decision based on a factual determination is not to be overturned on factual grounds unless it is "objectively unreasonable in light of the evidence presented in the state court proceeding." *Stanley*, 633 F.3d at 859 (quoting *Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2004)).

473 (2007); *Lockyer*, 538 U.S. at 75 (it is "not enough that a federal habeas court, in its independent review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'"). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103.

If the state court's decision does not meet the criteria set forth in § 2254(d), a reviewing court must conduct a de novo review of a habeas petitioner's claims. *Delgadillo v. Woodford*, 527 F.3d 919, 925 (9th Cir. 2008); *see also Frantz v. Hazey*, 533 F.3d 724, 735 (9th Cir. 2008) (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by considering de novo the constitutional issues raised.").

In evaluating whether the petition satisfies § 2254(d), a federal court looks to the last reasoned state court decision. *Stanley*, 633 F.3d at 859; *Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004). If the last reasoned state court decision adopts or substantially incorporates the reasoning from a previous state court decision, the court may consider both decisions to ascertain the reasoning of the last decision. *Edwards v. Lamarque*, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc). "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Richter*, 562 U.S. at 99. This presumption may be overcome by a showing "there is reason to think some other explanation for the state court's decision is more likely." *Id*. at 99-100 (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991)). Similarly, when a state court decision on a petitioner's claims rejects some claims but does not expressly address a federal claim, a federal habeas court

must presume, subject to rebuttal, that the federal claim was adjudicated on the merits. *Johnson v. Williams*, 568 U.S. 289, 293 (2013).

Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under § 2254(d). *Stanley*, 633 F.3d at 860; *Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003). "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." *Himes*, 336 F.3d at 853. Where no reasoned decision is available, the habeas petitioner still has the burden of "showing there was no reasonable basis for the state court to deny relief." *Richter*, 562 U.S. at 99-100.

When it is clear, however, that a state court has not reached the merits of a petitioner's claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal habeas court must review the claim de novo. *Stanley*, 633 F.3d at 860; *Reynoso v. Giurbino*, 462 F.3d 1099, 1109 (9th Cir. 2006); *Nulph v. Cook*, 333 F.3d 1052, 1056 (9th Cir. 2003).

**B.  Petitioner's Claim of Instructional Error**

First, petitioner claims that the trial court erred by adding language to a jury instruction. ECF No. 1 at 5. The state appellate court addressed this claim as follows:

> *I.  Mistake of Law*
>
> "Mistake of law is a defense where the mistake negates the specific intent required for the crime." (*People v. Flora* (1991) 228 Cal. App. 3d 662, 669.) "[A] mistake of law instruction is only appropriate where the evidence supports a reasonable inference that the claimed mistake was held in good faith." (*Ibid.*) "'Whether a claim is advanced in good faith does not depend solely upon whether the claimant believes he was acting lawfully; the circumstances must be indicative of good faith.' [Citations.] For example, the circumstances in a particular case might indicate that although defendant may have 'believed' he acted lawfully, he was aware of contrary facts which rendered such a belief wholly unreasonable, and hence in bad faith." (*People v. Stewart* (1976) 16 Cal. 3d 133, 140.)
>
> *A.  Background*
>
> Before defendant put on his case, the trial court summarized for the record in chambers discussion with counsel regarding an instructional issue pertinent to the mistake of law defense. The trial court said, if it found the evidence sufficient to give the mistake of law instruction, it would likely instruct the jury that defendant could not claim mistake of law if "the jury found that the taking was by force, violence, fear, duress, menace, any of those things, as described by the

9

[prosecution's] witnesses in this case." The trial court explained the pinpoint instruction would be appropriate in light of *Flora*, a case identified "in the use notes in CALCRIM," in which the Court of Appeal found the good faith requirement "negated by both a taking of force and a concealment from both law enforcement and rightful guardians." (Citing *People v. Flora*, 228 Cal. App. 3d at p. 662.)

Before instructing the jury, the trial court again raised the issue with counsel. The trial court explained it added a paragraph to the pattern jury instruction stating, "if you find the taking of the child in this case was accomplished by force or fear, the defense of mistake[] of law is not available to the defendant," referring counsel to *Flora*. The court explained it read *Flora* to say "that when a child abduction is conducted with force and thereafter flight and concealment, that the claim in good faith . . . is basically not available" because the conduct does not comport with a reasonable good faith belief. Counsel agreed to the court's proposed addition; and the court instructed the jury accordingly.

In *Flora*, the defendant was found guilty of felony violation of a child custody order, (*People v. Flora, supra,* 228 Cal. App. 3d at p. 664.) Briefly stated, the pertinent facts were that the defendant knew his wife was granted temporary custody of their child by a Washington court, kidnapped the child in California by shoving his wife aside and driving off in her car with the child in the passenger seat, took the child to Costa Rica, and threatened to kill his wife and preclude her from seeing the child if she did not adhere to his demands. (*Id.* at pp. 664-666.) On appeal, the defendant argued, among other things, that the trial court erred in refusing to instruct the jury on mistake of law as a defense. (*Id.* at p. 669.) The defendant claimed his mistake arose from erroneous advice he received from counsel that the Washington order was invalid and unenforceable in California. (*Id.* at pp. 669-670.)

The Court of Appeal disagreed, explaining: "Here, appellant's conduct does not comport with his claim of good faith. The manner in which appellant forcibly took [his son], detained him, and concealed him from [his mother] and the law belies his protestation of good faith. If appellant truly believed that the Washington order was invalid and not enforceable in California, he would not have acted as he did: hide from [his wife] and the law, even fleeing the country. In acting like the fugitive that he was, appellant only succeeded in demonstrating his consciousness of guilt. As the court in *Stewart* said: ' " Whether a claim is advanced in good faith does not depend solely upon whether the claimant believes he was acting lawfully; the circumstances must be indicative of good faith." ' " (*People v. Flora, supra*, 228 Cal. App. 3d at pp. 669-670, quoting *People v. Stewart, supra*, 16 Cal. 3d at p. 140.

### B. People v. Flora – A Good Faith Belief

Defendant argues the language added to the mistake of law pattern instruction deprived him of his due process and jury trial rights because it was for the jury to determine whether, under all of the relevant facts and circumstances, defendant lacked the specific intent to violate the law. He argues *Flora* has not been followed with regard to the good faith analysis, and in any event, the case is distinguishable because "the court applied a harmless error review standard to reject the claim of error without addressing whether the defendant's affirmative evidence, if believed, would have been sufficient to warrant the instruction." He further asserts the error was prejudicial and must be reviewed under the federal harmlessness standard set forth in *Chapman*. (*Chapman v. California* (1967) 386

10

U.S. 18, 24 [17 L.Ed.2d 705, 710-711] ["before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt"].)

The People disagree, arguing the instructional error claim has been forfeited for failure to object at trial, the instruction was correct and appropriate, and, even if the instruction was erroneous, the error was harmless when applying the state harmlessness standard set forth in *Watson,* which they contend is the appropriate standard. (*People v. Watson* (1956) 46 Cal. 2d 818, 836 ["a 'miscarriage of justice' should be declared only when the court, 'after an examination of the entire ca[]se, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error"].)

As the People note, "[a] trial court has no sua sponte duty to revise or improve upon an accurate statement of law without a request from counsel [citation], and failure to request clarification of an otherwise correct instruction forfeits the claim of error for purposes of appeal [citation]." (*People v. Lee* (2011) 51 Cal. 4th 620, 638.) "But that rule does not apply when . . . the trial court gives an instruction that is an incorrect statement of the law," as defendant asserts here. (*People v. Hudson* (2006) 38 Cal. 4th 1002, 1012. We, accordingly, consider the merits of defendant's challenge.

We do not read *Flora* to mean that the use of force or fear precludes a mistake of law defense *as a matter of law* in every case. That said, there is certainly logic to the idea that the strong public policy considerations disfavoring self-help through force or fear should pre[c]lude application of a good faith defense like mistake of law where the risk of harm to a child is substantial, as here. (See *People v. Richards* (2017) 18 Cal. App. 5th 549, 564 ["The defense of mistake of fact is not appropriate where its recognition would excuse behavior that violates a strong public policy"]; *Pacific Gas & Electric Co. v. Bear Stearns & Co.* (1990) 50 Cal. 3d 1118, 1137 [Our legal system is based on the idea that it is better for citizens to resolve their differences in court than to resort to self-help or force"]; *People v. Tufunga* (1999) 21 Cal. 4th 935, 953, 955 ["The legitimacy of the need for our laws to discourage forcible or violent self-help as a reedy seems beyond question" and "strong public policy militat[es] against self-help by force or fear"].) Yet, a good faith defense has been deemed appropriate in some circumstances where force was used as a self-help remedy. (See, e.g., *Tufunga*, at p. 956 ["if the jury, properly instructed, believed defendant's testimony, then . . . defendant's actions in seeking to recover from the victim albeit with force, what he believed in good faith was his *specific property*, no matter how reprehensible and otherwise unlawful those actions may have been, did not constitute a felonious taking necessary for conviction of robbery"].)

We need not consider whether the instruction given was a correct statement of law because, even if the instruction was erroneous, defendant cannot show prejudice under *Watson* or *Chapman*. There was considerable evidence defendant knew he did not have a right to custody of his son when he took him: (1) he knew his child was taken by Children's Services; [(2)] he told the Children's Services social worker it was wrong to keep his child from him; (3) Kenya testified she gave defendant notice of the temporary guardianship hearing and her phone records confirmed the call; (4) Kenya's subsequent text message to defendant confirmed there were steps he needed to take to regain custody of his son; (5) Crissy testified defendant knew Kenya had custody and there was a process to regaining custody; and (6) defendant went to Kenya's house armed with a knife.

11

>More significantly, however, the outcome in this case would have been no different if the jury believed defendant's and Kim's testimony because their testimony did not establish that defendant *maintained* a good faith belief that he had a right to custody of his child *during the commission of the crimes.*
>
>Defendant's mistake of law defense was premised on his asserted belief that he had equal legal right to custody of his son. The first of the crimes of which he was convicted – kidnapping – is, however, a *continuing offense*. (*People v. Barnett* (1998) 17 Cal 4th 1044, 1159 ["the crime of kidnapping continues until such time as the kidnapper releases or otherwise disposes of the victim and has reached a place of temporary safety"].) It was undisputed a police officer spoke with defendant shortly after the kidnapping and advised him that Kenya had legal custody of the child and he needed to return the child to her. Defendant responded, "it didn't matter what a [j]udge said." Thus, even if defendant initially had a good faith belief he was entitled to take custody of his son, no reasonable jury could conclude that he *continued* to maintain that belief in good faith after the conversation with the officer while he continued driving to Redding with his son. Defendant was on notice his conduct was potentially illegal, yet he did nothing to remedy the situation. He, instead, dropped Christina off approximately a block from her house because he believed police would be waiting for him and then affirmatively hid from the police demonstrating a consciousness of guilt and absence of a good faith belief in his right to custody. He "figured [he] had [his] baby [and he] wasn't giving him up." These circumstances render any claimed mistake in good faith unreasonable. (See *People v. Stewart, supra*, 16 Cal. 3d at p. 140 ["the circumstances in a particular case might indicate that although defendant may have 'believed' he acted lawfully, he was aware of contrary facts which rendered such a belief wholly unreasonable, and hence in bad faith"].)
>
>The second crime of which defendant was convicted, child abduction, provides it is a crime for a person without a right of custody to maliciously take, or keep, or withhold, or conceal a child from his or her lawful custodian. Even if the jury believed defendant took the child under a mistake of law, no reasonable jury could conclude he kept, withheld, and concealed the child with a good faith belief because defendant kept, withheld, and concealed his son from his lawful custodian, Kenya, after a police officer told him Kenya was his son's legal custodian.
>
>For the foregoing reasons, even if the mistake of law instruction was erroneous, the error was harmless beyond a reasonable doubt.

ECF No. 19-11 at 8-14.

Petitioner maintains that the trial court committed prejudicial error in adding language to the jury instruction. ECF No. 1 at 16. According to petitioner, the alleged instructional error violated his right to due process and to a fair trial. *Id.* Specifically, petitioner alleges that the additional language added by the trial court "effectively removed the Jury's discretion in determining the underlying issue of [petitioner's] good faith." *Id.* at 18.

In *Fry v. Pliler*, 551 U.S. 112, 121-22 (2007), the United States Supreme Court clarified that the AEDPA did not replace the traditional test for prejudice on collateral review established

in *Brecht v. Abrahamsom*, 507 U.S. 619, 637 (1993). After *Fry*, a federal habeas court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the 'substantial and injurious effect' standard set forth in *Brecht*. Further, "[w]hen a state court has found a constitutional error to be harmless beyond a reasonable doubt, a federal court may not grant habeas relief unless the state court's determination is objectively unreasonable." *Towery v. Schriro*, 641 F.3d 300, 307 (9th Cir. 2010).

As set forth above, the California Court of Appeal concluded that any instructional error in this case was "harmless beyond a reasonable doubt." ECF No. 19-11 at 14.[4] Specifically, the state court found that there was considerable evidence that petitioner knew he did not have the right to custody to his son when he took him, thus negating his mistake of law defense. For example, petitioner knew his child had been taken by Children's Services, he had been given notice of the temporary guardianship hearing, there was witness testimony that petitioner knew he did not have custody of his child, and he went to Kenya's house armed with a knife. *Id.* at 12.

In addition, even if the jury had believed testimony that petitioner had a good faith belief that he had custody of his child when he took him, the "testimony did not establish that defendant *maintained* a good faith belief that he had a right to custody of his child *during the commission of the crime*." *Id.* at 12-13. Kidnapping is a "continuing offense" and "[i]t was undisputed a police officer spoke with defendant shortly after the kidnapping and advised him that Kenya had legal custody of the child and he needed to return the child to her." *Id.* at 13. As the California Court of Appeal reasonably concluded, "no reasonable jury could conclude that [petitioner] *continued* to maintain that belief in good faith after the conversation with the officer." *Id.* With regards to petitioner's conviction for child abduction, the state court also reasonably found that "no reasonable jury could conclude [petitioner] kept, withheld, and concealed the child with a good faith belief" after the phone call with the police office. *Id.* at 13-14.

/////

/////

---

[4] The state court did not determine whether the mistake of law instruction itself was in error, and instead focused on whether any error was harmless beyond a reasonable doubt; as such, this court need not determine whether the instruction itself was erroneous.

Petitioner has not established that the state court's finding that any instructional error was harmless beyond a reasonable doubt is objectively unreasonable. *See Towery*, 641 F.3d at 307. Accordingly, petitioner is not entitled to federal habeas relief on this claim.

### C. Petitioner's Claim of Ineffective Assistance of Counsel

Second, petitioner claims that his trial counsel rendered ineffective assistance by failing to request a mistake of fact instruction at trial. ECF No. 1 at 7. The state appellate court addressed this claim as follows:

> ### II. *Mistake of Fact*
>
> "'A mistake of fact' is where a person understands the facts to be other than they are; whereas a "mistake of law" is where a person knows the facts as they really are, but has a mistaken belief as to the legal consequences of those facts.'" (*People v. La Marr* (1942) 20 Cal. 2d 705, 710.) A mistake of fact requires "an honest and reasonable belief in the existence of circumstances, which, if true, would make the act with which the person is charged an innocent act." (*People v. Russell* (2006) 144 Cal App. 4th 1415, 1425.) "A person who commits an act or makes an omission under a mistake of fact which disproves his or her criminal intent, is excluded from the class of persons who are capable of committing crimes." (*Ibid.*)
>
> Defendant argues his trial counsel was ineffective for failing to request an instruction on the mistake of fact defense because it was more favorable to him than the mistake of law defense. He asserts precedent establishes the specific intent required for kidnapping and child abduction is "negated in the absence of a court order or decree affecting custody, and such absence is an absolute defense to the offenses." (Citing *Cline v. Superior Court* (1982) 135 Cal. App. 3d 943, 947 [a parent does not commit child abduction by taking exclusive possession of his or her child absent a court order or decree affecting custody].) He asserts his mistake of fact as to the existence of a lawful custody order thus negates the specific intent required for kidnapping and child abduction.
>
> Respondent asserts trial counsel was not ineffective because: (1) *Flora* established the type of mistaken belief at issue was a mistake of law; (2) "trial counsel could have reasonably determined that a mistake of fact instruction would not affect the trial any differently than the mistake of law instruction"; and (3) defendant cannot establish he was prejudiced by any failure to give the instruction.
>
> To prevail on a claim of ineffective assistance of counsel, defendant must show there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. (*Strickland v. Washington* (1984) 466 U.S. 668, 694 [80 L.Ed.2d 674, 698].) We presume " 'counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy. Defendant thus bears the burden of establishing constitutionally inadequate assistance of counsel.' " (*People v. Carter* (2005) 36 Cal, 4th 1114, 1189.) If the appellate record " 'sheds no light on why counsel acted or failed to act in the manner challenged, an appellate claim of ineffective assistance of counsel must be rejected unless counsel was asked for an explanation and failed to provide one, or there simply could be no satisfactory explanation.' " (*Ibid.*) "If it is easier to

> dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." (*Strickland,* at p. 697 [80 L.Ed.2d at p. 699].)
>
> We dispose of this argument on the ground of lack of prejudice. As explained ante with regard to the mistake of law instruction, there is no reasonable probability the result would have been different if defense counsel had requested a mistake of fact instruction. Even if the jury believed defendant had a good faith belief that he had a right to custody of his son, the evidence showed defendant could not reasonably have maintained such a belief during the commission of the crimes. Thus, we find no merit in defendant's ineffective assistance of counsel argument.

ECF No. 19-11 at 14-15.

The Sixth Amendment guarantees the effective assistance of counsel. The United States Supreme Court set forth the test for demonstrating ineffective assistance of counsel in *Strickland*, 466 U.S. at 687-88. To support a claim of ineffectiveness of counsel, a petitioner must first show that considering all the circumstances, counsel's performance fell below an objective standard of reasonableness. *Id.* After a petitioner identifies the acts or omissions that are alleged not to have been the result of reasonable professional judgment, the court must determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. *Id.* at 690; *Wiggins v. Smith*, 539 U.S. 510, 521 (2003). Second, a petitioner must establish that he was prejudiced by counsel's deficient performance. *Strickland*, 466 U.S. at 693-94. Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id. See also Laboa v. Calderon*, 224 F.3d 972, 981 (9th Cir. 2000). A reviewing court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice. . . . that course should be followed." *Pizzuto v. Arave*, 280 F.3d 949, 955 (9th Cir. 2002) (quoting *Strickland*, 466 U.S. at 697).

In assessing an ineffective assistance of counsel claim, "[t]here is a strong presumption that counsel's performance falls within the 'wide range of professional assistance.'" *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986) (quoting *Strickland*, 466 U.S. at 689.). There is also a

strong presumption that counsel "exercised acceptable professional judgment in all significant decisions made." *Hughes v. Borg*, 898 F.2d 695, 702 (9th Cir. 1990) (citing *Strickland*, 466 U.S. at 689).

Petitioner cannot demonstrate that the state court's decision finding lack of prejudice was an unreasonable application of clearly established federal law.[5] Petitioner maintains that he was unaware of a court order regarding custody of his son, and that the failure of his attorney to request the mistake of fact instruction deprived him of a viable defense. ECF No. 1 at 20-22. As the California Court of Appeal cogently explained, however, "[e]ven if the jury believed defendant had a good faith belief he had a right to custody of his son, the evidence showed defendant could not have maintained such a belief during the commission of the crimes." ECF No. 19-11 at 15. In other words, even if the evidence showed that petitioner did initially have a good faith belief that no relevant court order was in place (*i.e.,* a mistake of fact), it was undisputed that a police officer informed petitioner shortly after he took his son that Kenya had legal custody, and petitioner was thus obligated to return his son to her. *Id.* at 14. Thus, petitioner could not have reasonably maintained his alleged mistaken factual belief during the commission of the kidnapping and the child abduction.

Considering the given instructions as a whole and all of the evidence introduced at petitioner's trial, counsel's failure to request the additional jury instruction suggested by petitioner does not undermine confidence in the outcome. The decision by the California Court of Appeal rejecting petitioner's claim of ineffective assistance of counsel is not an unreasonable application of *Strickland*. Accordingly, petitioner is not entitled to habeas relief on this claim.

/////
/////
/////
/////
/////

---

[5] Like the California Court of Appeal, this court resolves petitioner's claim on prejudice grounds. *See Pizzuto*, 280 F.3d 949, 955 (quoting *Strickland*, 466 U.S. at 697).

## IV. RECOMMENDATION

For the reasons stated above, it is hereby RECOMMENDED that the petition for writ of habeas corpus be DENIED.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1). Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Failure to file objections within the specified time may waive the right to appeal the District Court's order. *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991). In his objections petitioner may address whether a certificate of appealability should issue in the event he files an appeal of the judgment in this case. *See* Rule 11, Federal Rules Governing § 2255 Cases (the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant).

Dated: August 7, 2023.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE